COMMONWEALTH *vs.* JAMES J. PRATT
(and nine companion cases[1]).

Essex. February 5, 1990. - June 14, 1990.

Present: LIACOS, C.J., WILKINS, NOLAN, & LYNCH, JJ.

*Controlled Substances. Conspiracy. Practice, Criminal,* Argument by
counsel, Instructions to jury. *Constitutional Law,* Search and seizure,
Privacy. *Search and seizure,* Affidavit, Expectation of privacy, Probable
cause. *Privacy. Probable Cause.*

Evidence at the trial of indictments for violation of the controlled sub-
stances laws was sufficient to warrant the inference that the defendant
knew that the contraband was present and that she had the ability and
intention to exercise dominion and control over it; and the quantity of
drugs found and the manner of packaging warranted an inference of an
intent to distribute. [651-653]

At the trial of indictments alleging a conspiracy to violate the controlled
substances statutes, sufficient evidence of a conspiracy was introduced
to warrant submission of the indictments to the jury for consideration.
[653-654]

At a criminal trial the judge's remarks admonishing the jury to refrain
from speculation did not impermissibly frustrate the defendant's oppor-
tunity to raise reasonable doubts based on the evidence before the jury
and the fair inferences to be drawn therefrom. [654-658]

In a criminal case the evidence introduced at a hearing held pursuant to
*Franks* v. *Delaware,* 438 U.S. 154 (1978), supported the determination
of the judge that the affiant did not act in bad faith in omitting men-
tion, in the affidavit in support of a search warrant, of a previous search
warrant directed toward the defendant that uncovered no contraband.
[658-659]

A criminal defendant could claim no reasonable expectation of privacy in a
bag of trash he had placed at the curbside for collection. [659-661]

An affidavit in support of a search warrant provided sufficient information
to establish probable cause to search the land behind a certain resi-
dence for controlled substances. [661-662]

---

[1]Six against Penny S. Pratt and three against James J. Pratt.

INDICTMENTS found and returned in the Superior Court Department on October 28, 1987.

A pretrial motion to suppress evidence was heard by *Charles M. Grabau*, J., and the cases were tried before *Andrew G. Meyer*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Brownlow M. Speer*, Committee for Public Counsel Services, for James J. Pratt.

*Lissa C. Pancare* for Penny S. Pratt.

*Robert J. Bender*, Assistant District Attorney, for the Commonwealth.

LIACOS, C.J. The defendants James J. Pratt (Pratt) and his wife, Penny S. Pratt (Mrs. Pratt), were convicted by a jury in the Superior Court in Essex County of several violations of the General Laws relating to the possession and distribution of certain controlled substances.[2] Mrs. Pratt claims that the trial judge erred in denying her motion for a re-

---

[2]Pratt was convicted of possession of a class B controlled substance, methaqualone, with intent to distribute, in violation of G. L. c. 94C, § 32A (1988 ed.); of conspiracy with Mrs. Pratt to possess a class B controlled substance, methaqualone, with intent to distribute, in violation of G. L. c. 94C, § 40 (1988 ed.); of possession of a class A controlled substance, heroin, with intent to distribute, in violation of G. L. c. 94C, § 32 (*a*) (1988 ed.); of conspiracy with Mrs. Pratt to possess a class A controlled substance, heroin, with intent to distribute, in violation of G. L. c. 94C, § 40; of possession of a class B controlled substance, methadone, in violation of G. L. c. 94C, § 34 (1988 ed.); and of possession of a hypodermic syringe or needle, in violation of G. L. c. 94C, § 27 (*a*) (1988 ed.).

Mrs. Pratt was convicted of possession of a class B controlled substance, methaqualone, with intent to distribute, as a second offender, in violation of G. L. c. 94C, § 32A (1988 ed.); of conspiracy with Pratt to possess a class B controlled substance, methaqualone, with intent to distribute, in violation of G. L. c. 94C, § 40; of possession of a class A controlled substance, heroin, with intent to distribute, in violation of G. L. c. 94C, § 32 (*a*); of conspiracy with Pratt to possess a class A controlled substance, heroin, with intent to distribute, in violation of G. L. c. 94C, § 40; of possession of a class B controlled substance, methadone, in violation of G. L. c. 94C, § 34; of possession of a hypodermic syringe or needle, in violation of G. L. c. 94C, § 27 (*a*).

The defendants waived their right to have the conspiracy indictments tried separately. See Mass. R. Crim. P. 9 (e), 378 Mass. 859 (1979).

quired finding of not guilty as to all of the charges against her, while Pratt claims that the trial judge erred in denying his motion for a required finding of not guilty with respect to the conspiracy charges. Pratt also claims that the trial judge improperly instructed the jury not to consider a portion of his closing argument, and that the motion judge erred in denying his motion to suppress evidence. For the reasons stated below, we affirm the convictions. .

1. *Facts.* We summarize the evidence in a light most favorable to the Commonwealth, considering the evidence at the close of the Commonwealth's case. *Commonwealth* v. *Mazza*, 399 Mass. 395, 395 (1987).

In the early morning hours of October 19, 1987, State Trooper Gregory Dern and about fourteen fellow State troopers prepared to execute a warrant to search for drugs at a house located at 194 Southern Avenue in Essex, as well as at a small one-room cottage behind the house, a small shed, the land behind the property, and the persons of Pratt and Mrs. Pratt. One Lieutenant James Jajuga stopped Pratt on Route 128 and transported him to the house in Essex, which was owned by Pratt's parents. While one group of officers detained Pratt at the house, another group of officers proceeded to the small cottage which was located behind the house, and which served as the Pratts' residence.

State Trooper Dern knocked on the cottage door. A female voice responded from within the cottage, "Who is it?" Dern replied that it was the police, that he had a warrant, and asked the occupant to open the door. There was a pause. Again the voice in the cottage said, "Who is it?" Dern answered, "Police. I have a warrant. Will you open the door, please." Yet, again, the woman's voice asked, "Who is it?" At this point, Dern forced the door open and entered the cottage.

On entering the cottage, Trooper Dern and the police officers accompanying him observed Mrs. Pratt lying in bed. Dern showed Mrs. Pratt the search warrant, explained the officers' purpose for being in the cottage, and began searching the cottage. In plain view, sitting on a stove, was a gold-

colored bowl containing some partially burnt glassine bags with the term "7-LIFE" stamped on them.[3] Also located on the stove was a spoon that was burned on the bottom, with a small swab of cotton on top,[4] and some additional glassine bags.

The search in the cottage proceeded. After five or ten minutes, Trooper Brian Lilly was about to search some shelves above the bed, where some folded towels, stockings, and toiletries lay. Just as Lilly was reaching for the shelf, Mrs. Pratt got out of bed, pointed to the shelf, and began to speak.[5] While officers held Mrs. Pratt, Lilly searched the shelf. He found a brown wrapper, within which were forty-four glassine bags, each bearing the inscription "7-LIFE." They were wrapped in packets of ten, except for one packet which contained four bags. Each bag contained heroin. Also on the shelf were forty-four round tablets wrapped in a piece of tinfoil, later identified as methaqualones.[6] In the same place, the police found a brown bottle which contained fifty-two methadone tablets, as well as seven hypodermic needles and seven syringes.

From behind the stove, the police seized a small bag of white powdered substance which proved to be dextrose, commonly used as a dilutant in heroin. They also found documents in a cannister under the bed, including identification cards with the Pratts' names on them, as well as the Pratts' marriage certificate. Near the bed was a telephone; next to the telephone the police found a piece of paper with some handwritten notations relating to drug transactions.

---

[3] "7-LIFE" is apparently a brand name of a type of heroin popular in the Cape Ann area. A single "glassine bag" commonly contains a single dosage of heroin. The price of one bag of heroin in October, 1987, was approximately $50.

[4] A spoon often is used to heat heroin. A cotton swab often is used to strain the heroin.

[5] Her statement was not admitted in evidence.

[6] Methaqualone, also known as "qualude" or "lude," is a tranquilizing drug no longer manufactured in this country, which, as of October, 1987, carried a value of approximately $5 a pill.

After the search of the cottage was completed, approximately fifteen police officers formed a line and started walking from the rear of the cottage across the property, turning over rocks and logs in search of drugs. One officer overturned a rock, lifted up a square matted patch of sod, and found a white plastic bag containing a glass jar with white pills in it. Nearby, two more pill-filled bottles were found. In total, 1,357 methaqualone pills were discovered. Under a rotted log, the police found a plastic container wrapped inside a black trash bag. In the container were four aluminum foil packages; inside each package were two brown packages, each of which contained approximately fifty glassine bags of heroin with the inscription "7-LIFE" stamped on them, wrapped in units of ten.

2. *Sufficiency of the evidence.* Arguing that there was insufficient evidence to prove that she was in possession of the contraband in the cottage or on the property, Mrs. Pratt claims that the trial judge erroneously denied her motion for a required finding of not guilty. We disagree.

"The essential question in evaluating the denial of a motion for a required finding of not guilty is whether the evidence received, viewed in a light most favorable to the Commonwealth, is sufficient so that the jury 'might properly draw inferences, not too remote in the ordinary course of events, or forbidden by any rule of law, and conclude upon all the established circumstances and warranted inferences that the guilt of the defendant was proved beyond a reasonable doubt.'" *Commonwealth* v. *Pope*, 406 Mass. 581, 584 (1990), quoting *Commonwealth* v. *Clary*, 388 Mass. 583, 588 (1983).

"Possession implies 'control and power,' . . . exclusive or joint . . . or, in the case of 'constructive possession,' knowledge coupled with the ability and intention to exercise dominion and control." *Commonwealth* v. *Brzezinski*, 405 Mass. 401, 409 (1989), quoting *Commonwealth* v. *Rosa*, 17 Mass. App. Ct. 495, 498 (1984).

The evidence warranted an inference that Mrs. Pratt had knowledge of the drugs found. She had been sitting quietly

on the bed as the police conducted their search, and only when a police officer reached a shelf which contained a large quantity of contraband, at least five minutes into the search, did Mrs. Pratt get up from the bed, point to the shelf, and begin to speak. The jury could infer that Mrs. Pratt's gesture stemmed from her knowledge of the contraband's presence.[7] In addition, there was evidence that drugs, drug paraphernalia, and a drug transaction list were in plain view in the small one-room cottage. See *Commonwealth* v. *Brzezinski, supra* at 410; *Commonwealth* v. *Buckley,* 354 Mass. 508, 513 (1968). The fact that the drugs found in the woods were packaged in an identical manner to those found in the cottage, and that they were of the same type and "brand," allowed an inference that Mrs. Pratt knew of their presence.

The jury could also infer that Mrs. Pratt had the ability and intention to exercise dominion and control over the contraband. There was evidence that Mrs. Pratt resided with Pratt in the cottage where a portion of the contraband was stored. "When contraband is found in a dwelling shared by a defendant and one or more other persons, a finder of fact may properly infer that the defendant is in possession of the contraband . . . from evidence that the contraband was found in proximity to personal effects of the defendant in areas of the dwelling, such as a bedroom or closet, to which other evidence indicates the defendant has a particular relationship." *Commonwealth* v. *Rarick,* 23 Mass. App. Ct. 912, 912 (1986), and cases cited. Forty-four bags of heroin, forty-four methaqualude tablets, a bottle of methadone tablets, and seven syringes and needles were all found on an open shelf amidst towels, stockings, and toiletries. From her possession of the drugs in the cottage, from the similarity between the packaging and the type of drugs found in the cottage and those found in the woods, from her knowledge, as evidenced by the drug transaction sheet, of the scale of the drug opera-

---

[7]Mrs. Pratt's delay in opening the door could be considered by the jury as an indication of consciousness of guilt. See *Commonwealth* v. *Brzezinski, supra* at 410.

tion, and from her access to and use of the surrounding property, the jury could infer that Mrs. Pratt was in possession of the drugs found on the property.

There was also sufficient evidence presented for the jury to find that Mrs. Pratt harbored the requisite intent to distribute. "Possession of a large quantity of an illicit narcotic raises an inference of intent to distribute." *Commonwealth* v. *Sendele*, 18 Mass. App. Ct. 755, 758 (1984), and cases cited. See also *Commonwealth* v. *Gill*, 2 Mass. App. Ct. 653, 657 (1974). In conjunction with the quantity of drugs found, the manner of packaging permitted an inference of an intent to distribute. *Commonwealth* v. *Sendele, supra* at 758. There was evidence that the heroin was packaged in amounts of one dose per glassine bag, that each bag was marked with a brand name popular in the Cape Ann area, and that the bags were bundled into groups of ten and wrapped together in packages of fifty. A police officer testified that this method of packaging is a common practice for heroin distribution. The drug transaction list found in plain view in the cottage also could contribute to an inference of intent to distribute. See *Commonwealth* v. *DeCastro*, 24 Mass. App. Ct. 937, 939 (1987).

Pratt and Mrs. Pratt claim that there was insufficient evidence for the jury to find that a conspiracy existed and that, as to these indictments, the judge should have granted their motions for required findings of not guilty. We disagree.

The crime of conspiracy "is complete upon the formation of an agreement and a combination to commit, or cause[ ] to be committed, a crime or an unlawful act." *Commonwealth* v. *Nighelli*, 13 Mass. App. Ct. 590, 593-594 (1982), and cases cited. "A conspiracy may be proved by circumstantial evidence, and this is the usual mode of proving it, since it is not often that direct evidence can be had. The acts of different persons who are shown to have known each other, or to have been in communication with each other, directed towards the accomplishment of the same object . . . may be satisfactory proof of a conspiracy." *Commonwealth* v. *Smith*, 163 Mass. 411, 417-418 (1895).

There was sufficient evidence of a conspiracy to send the indictments to the jury. As discussed above, the jury could conclude that Mrs. Pratt possessed the contraband with intent to distribute. Further, there was sufficient evidence for the jury to find that Pratt himself was guilty of the same crime.[8] The jury could infer that the pair, living together in a one-room cottage, working toward a common end, were engaged in a conspiracy. See *Commonwealth* v. *Nighelli, supra* at 594. Mrs. Pratt need not have been so heavily involved in the operation as her husband in order for her to be found guilty of conspiracy. See *Attorney Gen.* v. *Tufts,* 239 Mass. 458, 493 (1921).[9]

3. *The judge's charge.* The defendant argues that the judge erroneously instructed the jury not to speculate as to the credibility of certain individuals not called by the Commonwealth to testify. There was no error.

The defendant, who represented himself at trial, grounded his defense on the theory that the four informants who were designated in the search warrant affidavit may have planted the drugs on his property. The defendant called the one informant who was named in the affidavit, Steve Lambert, a heroin addict, as a witness on his behalf. The identities of the other three informants, C-1, C-2, and C-3, had not been disclosed by the police, and a defense motion for disclosure of their identities had been denied. The defendant cross-examined police witnesses as to these informants' backgrounds.

---

[8]At trial, Pratt did not move for a required finding of not guilty as to the indictments not dealing with conspiracy. We add that there was additional evidence presented to the jury, not enumerated in our recitation of the facts, which would allow a jury to conclude that Pratt was heavily involved in a drug-dealing operation.

[9]Because he failed to raise the issue below, we choose not to address Pratt's argument that at common law he and his wife are incapable of forming a conspiracy. See *Commonwealth* v. *Oakes, ante* 92, 94-95 (1990). We perceive no substantial risk of a miscarriage of justice. *Id.* We also note that the question whether a husband and wife may be coconspirators is not a question of the sufficiency of the evidence, but a question of law. See *United States* v. *Dege,* 364 U.S. 51, 52 (1960).

One police officer testified that C-1 was a known heroin dealer. Another officer testified that C-2 was a heroin user and purchaser.

The defendant, in his closing argument to the jury, theorized that one or more of the informants may have framed him in order to curry favor with the police. Pratt included the following statement in his argument. "Is Steven Lambert the best that the Commonwealth had to offer? If he is the best the Commonwealth had to offer in this case, can you imagine what C-1, C-2 and C-3 are like? Can you imagine what sort of characters these people are?" In order to put this statement into context, we quote portions of the defendant's argument at length in the margin.[10]

---

[10]"I mean, why would a heroin dealer call up the police station and tell them: Hey, James Pratt is selling heroin? I'll tell you why they did it. Because they were under indictment. They were afraid to go to jail and they were willing to do anything to get out of jail, and what that included was putting drugs in my yard that has no fences, no gates. And I submit that that fingerprint on those containers may have been Steven Lambert's or any one of these confidential informants. If the Commonwealth in this case had so strong a case against me, why did they name Steven Lambert as an informant? Do you believe that Steven Lambert's testimony was credible in this case? First he said there were no promises made to him and then in the same breath he said he was released from custody. Why was he released from custody in a heroin case? I mean, there can only be one answer —he agreed to cooperate with the case and whatever means it took. You heard his testimony: I would do anything to get out of custody. Anything.

"Here's a man — and not just Steven Lambert but unnamed confidential informants — whose testimony showed they had been arrested ten, twenty times, and they are on the street. Heroin dealers, they are on that street today.

"They gave testimony that some of them may have been in custody when they made these statements. Wouldn't it seem reasonable that some brilliant entrepreneur, a major heroin trafficker who had been arrested would say: . . . What can I do to get out of this case?

"Well, one thing they could do is go walking up into the woods where there are no fences, in the middle of the country, and plant drugs. They can do that because they have no fear of having to be called in in front of a jury and asked: Hey, did you do that? There is no fear for that. They have no problem with doing it because what they have done will never be exposed. They can do anything they want because there is no fear of going to jail. There is no fear of being caught and there is no fear of being cross-examined. . . .

The judge, toward the beginning of his charge, made some comments related to the above portion of the defendant's argument. We quote the judge's instruction in context:

> "I want to discuss first of all what is evidence, and before I tell you what is evidence let's talk about what is not evidence, certain things you should put out of your mind and forget. It is obvious that when you go out and deliberate you should not come to any conclusion based on bias or prejudice or some preconceived hangup. That is not evidence. Put it out of your mind. Because you suspect something to be so, that's not evidence. Mere suspicion is not evidence. It is not evidence if you go out in the jury room and start guessing, engaging in conjecture.
>
> "*I believe at one point in final arguments it was said: Imagine what characters these people are — meaning C-1, C-2, C-3. I am telling you, don't imagine. That is engaging in a guessing game. Don't do that. That is not evidence. You can not imagine. You*

---

"You have heard about these confidential informants in this case. Do we know anything about them? Have we heard anything about these people? Do you know what kind of people they are? Are any of these confidential informants capable of doing this?

"We have heard Mr. Lambert. Do you remember Mr. Lambert? Do you remember what kind of person he was?

"In this case you are asked to convict me based on the evidence. . . . You are going to hear arguments that are going to say that you have heard testimony from credible witnesses. Well, I am not going to argue that the police are not credible. They may do things at times that in this case may seem a little high handed, but we know nothing of these other informants. We know nothing of C-1, C-2, C-3, heroin dealers, informants, confidential informants who, for whatever reason that we don't even know of because we will never see them, what motives, what opportunities and what reasons they had for either giving this information or trying to get out of jail. We don't know what they are capable of doing.

"Is Steven Lambert the best that the Commonwealth had to offer? *If he is the best that the Commonwealth had to offer in this case, can you imagine what C-1, C-2 and C-3 are like? Can you imagine what sort of characters these people are*" (emphasis supplied)?

*cannot guess. You can not speculate"* (emphasis supplied).[11]

Our analysis begins with the proposition that "[w]ithin the bounds of the evidence and the fair inferences from the evidence, great latitude should be permitted to counsel in argument." *Commonwealth* v. *Gilmore*, 399 Mass. 741, 745 (1987). Defense counsel may point out the weaknesses of the prosecution's case, including decisions of the Commonwealth not to introduce certain items of evidence. *Id.* at 744-746. "Counsel may suggest inferences which the jury may draw from the evidence, and the judge should not 'invade the province of the jury to decide what inferences to draw from certain evidence.' " *Id.* at 745, quoting *Commonwealth* v. *Bowden*, 379 Mass. 472, 486 (1980). Counsel may not ask the jury to speculate on occurrences not fairly inferable from the evidence. *Commonwealth* v. *Corriveau*, 396 Mass. 319, 339 (1985).

While it may have been preferable for the judge not to have singled out the defendant's words to illustrate the concept that the jury should refrain from engaging in speculation, the judge's remarks did not amount to error. The judge did not prevent the jury from considering aspects of the informants' credibility which were grounded in the evidence. Thus, the jury could take into account, consistent with the judge's instructions, that at least one of the informants was a known heroin dealer and that another was a heroin purchaser. The defendant was permitted to suggest that the failure of the Commonwealth to call the unnamed informants reflected adversely on the strength of the Commonwealth's case. The judge's instruction was a narrow admonition for the jury to refrain from "imagining" and engaging in a "guessing game." As such, it did not impermissibly frustrate the defendant's opportunity to raise reasonable doubts based

---

[11] The defendant (through his standby counsel) timely objected to the emphasized portion of the judge's charge.

on the evidence before the jury and the fair inferences which could be drawn therefrom.

4. *Search warrant.* Pratt challenges the validity of the search warrant and claims that the motion judge erred in denying his motion to suppress evidence seized pursuant to the warrant. We address each of the defendant's arguments seriatim.

a. *Material omission.* Pratt claims that a material omission of fact from the affidavit in support of the warrant rendered its contents unworthy of credence by the magistrate. The affidavit, submitted on October 16, 1987, contained ten paragraphs which had been previously submitted in April of that year in an affidavit accompanying an application in another court for a warrant to search Pratt. The search pursuant to the April warrant uncovered no contraband. In the October affidavit, the affiant did not mention the unsuccessful search and stated that he had "not previously submitted the same application." The October affidavit included additional paragraphs relating to events which transpired in October, 1987. Pratt claims that the omission from the October affidavit that a substantial portion of its contents had previously been submitted to another court, and that the execution of the resulting warrant had not revealed any contraband, requires that portion of the affidavit be struck.

The motion judge held a hearing pursuant to *Franks* v. *Delaware*, 438 U.S. 154 (1978), and *Commonwealth* v. *Nine Hundred & Ninety-two Dollars*, 383 Mass. 764 (1981). The burden at such a hearing is on the defendant to show by a preponderance of the evidence that the affiant made false statements in the warrant affidavit, "knowingly and intentionally, or with reckless disregard for the truth," *Franks, supra* at 155, misstatements which "bespeak bad faith," *Nine Hundred & Ninety-two Dollars, supra* at 771.[12]

---

[12]As yet, we have not had to decide whether the remedy for such a misstatement is excision of the false material or rather is "den[ial] of admissibility to all evidence obtained" pursuant to the resulting warrant. *Nine Hundred & Ninety-two Dollars*, 383 Mass. 764, 768 (1981). See *Com-*

The motion judge concluded that the affiant did not act in bad faith, and the evidence introduced at the hearing supported his determination. The motion judge could conclude that the affiant believed, in good faith, that he had "not previously submitted the same application," because the October affidavit contained significant new information relating to Pratt's alleged drug-dealing. Furthermore, the motion judge found that the police executed the April search warrant "prematurely" and that the affiant "attributed the failure on his actions and not on the information received from the informant." Considering that the affiant never doubted the existence of probable cause to support the April warrant, the motion judge properly could conclude that the affiant acted in good faith when he omitted references to the aborted search in the October affidavit. There was no error.

b. *Trash bag search.* One paragraph of the affidavit in support of the October search warrant included a description by the affiant of a search of a green trash bag which the police found in front of Pratt's residence.[13] Pratt claims that the search constituted a violation of his right against unrea-

---

*monwealth v. Ramos*, 402 Mass. 209, 215 n.4 (1988). We need not resolve that question today.

[13] The affidavit stated: "During the evening hours of Tuesday, October 13, 1987, Ryan, Sucharski and other Officers retrieved a green plastic trash bag which was abandoned directly in front of [ ] Pratt's residence at 194 Southern Ave., Essex. This green trash bag was obviously placed on the side of the road to be picked up by the contracted trash collector for Essex, Ma. A check with Essex authorities revealed that the trash pickup for Southern Ave., Essex is accomplished every other Wednesday. Wednesday, October 14, 1987 was the assigned day. The green trash bag was inventoried and the following items were located:

"A) A document bearing the name James Pratt, Southern Ave., Essex, Ma.

"B) Letterheads bearing the name 'Tracy Temporaries'.

"C) Several pieces of paper with numerical notations.

"D) Numerous glassine bags (partially burnt) one of which bears the Inscription 7-Life.

"E) Numerous empty brown packets.

"F) Syringe." The motion judge, in his findings, essentially credited the above account, additionally finding that the trash bag was three feet from the paved road next to a telephone pole located eight to ten feet from the driveway.

sonable searches and seizures under art. 14 of the Massachusetts Declaration of Rights, contending that he had a reasonable expectation of privacy in the contents of the trash bag. We disagree.

In considering whether there has been a search under art. 14, it must be determined whether the defendant had a subjective expectation of privacy which can be recognized as "reasonable." *Commonwealth* v. *Panetti*, 406 Mass. 230, 234-235 (1989). In the circumstances of this case, the defendant cannot be said to have had a reasonable expectation of privacy in the contents of his trash bag. The bag was placed three feet from the street near the driveway in front of Pratt's residence. It sat exposed to the public, waiting to be gathered up by the trash collector the following morning. This is not a case where police officers went to the defendant's back porch to seize garbage which had not yet been placed at the curbside for collection. See *People* v. *Edwards*, 71 Cal. 2d 1096 (1969). Rather, in this case the defendant can be said to have abandoned his privacy interests in his garbage through the placement of his trash bags at the curb for collection. See *Commonwealth* v. *Chappee*, 397 Mass. 508, 512-513 (1986) (same result under Fourth Amendment to the United States Constitution).

The fact that an Essex ordinance allowed only licensed trash collectors to transport garbage does not make the defendant's subjective expectation of privacy any more reasonable. The licensed collectors may have rummaged through the defendant's garbage themselves. Secondly, once the defendant knew that the garbage would be picked up by licensed collectors and deposited at the local landfill, he should have known that others could gain access to the garbage.

At least with respect to the facts of this particular case, we are not persuaded that our Constitution provides broader protection than the United States Constitution with regard to privacy interests in garbage. We agree with the Supreme Court's remarks in *California* v. *Greenwood*, 486 U.S. 35, 40 (1988): "It is common knowledge that plastic garbage bags left on or at the side of a public street are readily accessible

to animals, children, scavengers, snoops, and other members of the public. . . . Moreover, respondents placed their refuse at the curb for the express purpose of conveying it to a third party, the trash collector, who might himself have sorted through respondents' trash or permitted others, such as the police, to do so. Accordingly, having deposited their garbage 'in an area particularly suited for public inspection and, in a manner of speaking, public consumption, for the express purpose of having strangers take it,' . . . respondents could have no reasonable expectation of privacy in the inculpatory items that they discarded." (Footnotes and citations omitted.)

c. *Search of the land.* Pratt claims that the affidavit failed to establish probable cause to search the land behind the Pratt residence because it purportedly demonstrated no nexus between the evidence sought and the land. We disagree.

"An affidavit must contain enough information for the issuing magistrate to determine that the items sought are related to the criminal activity under investigation, and that they reasonably may be expected to be found in the place to be searched. *Commonwealth* v. *Cefalo,* 381 Mass. 319, 328-329 (1980). A nexus between the items to be seized and the place to be searched need not be based on direct observation and may be found in 'the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide stolen property.' " *Commonwealth* v. *Burt,* 393 Mass. 703, 715 (1985), quoting *Commonwealth* v. *Cinelli,* 389 Mass. 197, 213 (1983).

The affidavit provided sufficient information to show a nexus between the items to be seized and the land behind the defendant's house. One informant described a drug transaction which occurred between "him," a "second individual," and Pratt on or about October 16, 1987. The "second individual" telephoned Pratt at his cottage, and the two met Pratt a short distance from his residence, where the second individual handed Pratt an unspecified amount of money. "Pratt then took [the informant] and the second individual to

*a wooded area near 194 Southern Ave.* and directed the second individual *to a location where the heroin was secreted.* The retrieved packet was described by [the informant] as containing 50 glassine bags bearing the inscription 7-Life and wrapped in brown paper." (Emphasis supplied.) The informant then observed Pratt returning to his house. The affidavit also recited the informant's statement that "James Pratt is extremely cautious and fearful of police detection and once stated to [the informant] that if the police came to his residence they would never find the heroin because of the size of the property on which he lives and his method of secreting the heroin." The magistrate reasonably could infer from these statements in the affidavit that contraband could be expected to be found on the land surrounding the defendant's residence.[14]

For the above reasons the judgments are affirmed.

*So ordered.*

---

[14]We note that, while standing alone, the information relating to the defendant's activity in March and April would have failed to establish that probable cause existed in October to search the defendant and his premises, in this case "the affidavit described an ongoing criminal operation." *Commonwealth* v. *Burt,* 393 Mass. 703, 716 (1985). "[W]here an affidavit recites a mere isolated violation then it is not unreasonable to believe that probable cause quickly dwindles with the passage of time. On the other hand, if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance." *Id.,* quoting *Commonwealth* v. *Vynorius,* 369 Mass. 17, 25 (1975).