## COMMONWEALTH vs. STEVEN STOICO.

No. 97-P-1191.

Suffolk. April 14, 1998. - October 5, 1998.

Present: KASS, SMITH, & JACOBS, JJ.

*Controlled Substances. Conspiracy. Practice, Criminal,* Required finding, Complaint, Venue. *Evidence,* Hearsay. *District Court,* Jurisdiction.

Evidence at the trial of a complaint for conspiracy to distribute marihuana was sufficient to warrant the jury to rationally find all the elements of the offense beyond a reasonable doubt. [562-563]

At the trial of a criminal case, any inferences that the jury could have drawn from the testimony of a State trooper consisting of his extrajudicial statements were merely cumulative of other evidence and did not prejudice the defendant. [563-565]

A District Court judge correctly denied a criminal defendant's motion to dismiss the complaint, where the Commonwealth demonstrated probable cause for the defendant's arrest and for the issuance of the complaint [565]; where venue of the case was properly in Suffolk county [565-566]; and where jurisdiction of an alleged violation of G. L. c. 94C, § 40 (conspiracy to distribute marihuana), was properly in the District Court [566].

COMPLAINT received and sworn to in the Charlestown Division of the District Court Department on October 26, 1995.

A motion to dismiss was heard by *Peter W. Agnes, Jr.,* J., and the case was tried before *Daniel Klubock,* J.

*James H. Budreau* for the defendant.

*Joseph M. Makalusky,* Assistant District Attorney, for the Commonwealth.

KASS, J. Steven Stoico was convicted by a jury of six in the District Court of conspiring to distribute marihuana, see G. L. c. 94C, § 40, and sentenced to serve two years in a house of correction. Stoico raises three points on appeal: (1) his motion for a required finding of not guilty was wrongly denied; (2) certain hearsay statements of the police were mistakenly received in evidence; and (3) a pretrial motion to dismiss was erroneously denied. We affirm.

1. *Facts.* Viewing the evidence in the light most favorable to the Commonwealth, the jury could have found the following facts. Mark Marron, a State trooper assigned to narcotics investigation, received a tip that Phillip Moccia was receiving suspicious packages via Federal Express at his apartment in Charlestown. Marron inspected two recently arrived packages from Mesa, Arizona, addressed to Moccia. They were large and heavily taped. With the help of a trained police dog, who bit and scratched at the packages, Marron identified them as likely to contain narcotics. When Moccia came to the Federal Express facility in Medford on October 25, 1995, to pick up those packages (he had not been home when Federal Express earlier had tried to deliver them), he was greeted by Trooper Mark West, dressed in a Federal Express uniform. Moccia signed for the packages and began to load them into his car when Trooper Marron confronted him and opened one of the packages. Inside, Marron found blocks of what was later determined to be marihuana in five-gallon pails, heavily wrapped in clear plastic. Together, the packages contained a total of 43.8 pounds of marihuana, with a street value of between $40,000 and $170,000.

After advising Moccia of his Miranda rights, Marron invited Moccia to assist the police in their investigation, and to consent to a search of his apartment. Moccia signed a form consenting to the search and, accompanied by Trooper Marron, Trooper West, and Trooper Richard Prior, traveled to Moccia's apartment in Charlestown, with the marihuana.

The party arrived at Moccia's third floor apartment around 2:20 P.M. There the troopers found a small amount of marihuana, a scale, packaging materials, large plastic bags, hemp seeds, fifteen hundred dollars, an address book, and plastic pails similar to those in which the recently arrived marihuana from Mesa was packed. During the first twenty minutes of the search, Moccia received two phone calls. Moccia answered both calls and had brief conversations.

Immediately after the second call, at about 2:35 P.M., a white BMW, driven by a man later identified as the defendant Stoico, slowed down or stopped in front of the apartment. Stoico looked up at the apartment for about ten seconds, then drove off. Ten or fifteen minutes later, Stoico stopped in front of the apartment a second time, and then again drove away. A short time later, Moccia received a series of incoming calls. Trooper West went

down to the front foyer with the packages of marihuana, Moccia stood in front of an open window facing the street, Trooper Marron stood behind Moccia, and Trooper Prior stood in front of the other, partially open, window.

At around 3:15 P.M., while Moccia and the troopers were in conversation, Stoico called from below, "Phil, hey, Phil." Trooper Marron instructed Moccia to tell Stoico that the packages were in the front foyer. Moccia then leaned out of the window and Trooper Prior testified that the following exchange took place:

MOCCIA: "Hey, John [not Stoico's name], what are you doing here?"

STOICO: "What do you mean what am I doing here, do you have the packages or don't you?" [Trooper Prior added that Stoico sounded extremely irritated and possibly confused when asking this question.]

MOCCIA: "I thought Rich was coming by, what are you doing here?"

STOICO: "Do you have the packages or don't you?"

MOCCIA: "Yeah, I have them."

STOICO: "Did something go wrong, is something wrong, did something go wrong, what happened?"

During the entire conversation, Moccia was leaning out of the window motioning with his hands to Stoico to go away, and pointing with his thumb over his shoulder to the area where Trooper Marron was standing. Stoico doggedly declined to take the hint. After Stoico's final query, Moccia struck up a conversation with a passerby, and Stoico turned abruptly and left.

After Stoico left, Moccia received one more phone call, and then the troopers and Moccia left the apartment. When Stoico drove by a fourth time while Moccia and the troopers were standing outside preparing to leave, Trooper Marron pulled him over and arrested him. At the time of his arrest, Stoico was carrying an electronic pager ("beeper") and a cellular phone. There was a number listing for "Steve" in an address book of Moccia's that the police had found in their search of Moccia's apartment. Marron dialed the number listed and Stoico's beeper "went off."

2. *Sufficiency of the evidence.* At the close of the Com-

monwealth's case, Stoico moved unsuccessfully for a required finding of not guilty. Stoico renewed his motion after the jury's verdict, and the judge again denied the motion. Such a motion is properly denied when — viewing the evidence in the light most favorable to the prosecution — the jury rationally could have found all essential elements of the crime beyond a reasonable doubt. *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979). *Commonwealth* v. *Bush*, 427 Mass. 26, 30 (1998). *Commonwealth* v. *Kindell*, 44 Mass. App. Ct. 200, 206 n.5 (1998). To sustain a conviction for conspiring to distribute marihuana, the prosecution must have introduced evidence tending to show that Stoico made an agreement with another person to distribute marihuana. *Commonwealth* v. *Pero*, 402 Mass. 476, 479 (1988). *Commonwealth* v. *Pratt*, 407 Mass. 647, 653 (1990). Because a conspiracy is generally shrouded in secrecy, circumstantial evidence of the illegal agreement is the norm. *Commonwealth* v. *Camerano*, 42 Mass. App. Ct. 363, 366 (1997), and cases cited.

There was evidence of the following: (1) Moccia received a large amount of marihuana, worth as much as $170,000;[1] (2) Stoico addressed Moccia by his first name, Phil; (3) Stoico drove over to Moccia's place expecting that packages had arrived and was interested in those packages, namely the packages of marihuana; and (4) Moccia had Stoico's beeper number under the listing "Steve" in his address book. This reasonably supported inferences that Moccia and Stoico were acquainted, were in telephone contact, and intended to distribute the marihuana. See *Commonwealth* v. *Pratt, supra.*

The most damaging evidence came straight out of Stoico's mouth. The conversation between Stoico and Moccia, reproduced above, supports inferences that Stoico knew that Moccia was receiving multiple packages, that Stoico thought it ridiculous that Moccia would not know why he had come to the apartment, and that Stoico thought that something might have "gone wrong." If something could have "gone wrong," something could have "gone right" — that is to say, according to plan. It was not unreasonable for the jury to conclude that the two men had entered into an agreement for the distribution of the marihuana. See *Commonwealth* v. *Pero*, 402 Mass. at 479-480; *Commonwealth* v. *Pratt*, 407 Mass. at 653-654; *Commonwealth* v. *Cohen*, 6 Mass. App. Ct. 653, 659-660 (1978).

---

[1]"Possession of a large quantity of an illicit narcotic raises an inference of intent to distribute." *Commonwealth* v. *Sendele*, 18 Mass. App. Ct. 755, 758 (1984), and cases cited at 758 n.10.

The prosecutors need not disprove every possible theory of innocence. *Commonwealth* v. *Merola*, 405 Mass. 529, 533 (1989). *Commonwealth* v. *Kindell*, 44 Mass. App. Ct. at 207. They must only put forward enough evidence so that the jury is not forced to make a leap of faith — i.e., an inference based on speculation rather than a reasonable interpretation of the evidence — in order to find the defendant guilty. Contrast *Commonwealth* v. *Salemme*, 395 Mass. 594, 599-602 (1985); *Commonwealth* v. *Murphy*, 34 Mass. App. Ct. 16, 19 (1993); *Commonwealth* v. *Camerano*, 42 Mass. App. Ct. at 366-368.

3. *Claim of inadmissible hearsay.* Of several instances of hearsay that the defendant says were wrongly admitted and prejudicial, we consider two that involved admission of evidence over objection. First, in response to direct examination by the prosecutor, Trooper Marron said that while he and his fellow officers were searching Moccia's apartment, the telephone rang. The prosecutor asked Marron, "After he [Moccia] got off the phone, what did you do?" Marron began to answer, "I explained to Mr. Moccia that if anyone was trying to —" and at that point defense counsel objected. The judge overruled the objection. The prosecutor rephrased the question to pick up at the point where the objection had interrupted Marron, thus: "What did you explain to Mr. Moccia?" This time there was no objection, but defense counsel could reasonably have taken the judge to have ruled. Marron completed his answer: "I told him that if anyone was attempting to gain possession of these packages, tell them the packages were here and to come up and get them." Second, a bit later, when Marron was describing the conversation in which Stoico inquired from the street about the packages, the prosecutor asked, "When you heard someone say 'hey, Phil,' what did you do?" Trooper Marron answered, "I was over by Mr. Moccia and I was giving him instructions." The next question was, "What were you saying to him?" To this defense counsel immediately objected. The objection was overruled and to a slightly restated question, Marron replied, "I informed him to tell this person that the packages were in the front foyer."

In each of these instances, Trooper Marron was permitted to testify to an extrajudicial statement that would be subject to exclusion as hearsay unless an exception rendered the statement admissible or it was not hearsay because not offered to establish the truth of the content of the statement. See *Commonwealth* v.

564        45 Mass. App. Ct. 559 (1998)

Commonwealth v. Stoico.

*Soto,* 45 Mass. App. Ct. 109, 113 (1998), a case that also involved extrajudicial statements of a police officer. The vice of the questions to which the officer in the *Soto* case testified was that those questions suggested answers that pointed to the defendant, i.e., Soto, as the person who was the seller in a drug transaction that the police had observed, the central question in that case. In the case at bar, by contrast, the statements of Trooper Marron do not suggest any answers and they do not, as in *Soto,* go into excessive, specific, suggestive, and unnecessary detail. Compare *Commonwealth* v. *Soto,* 45 Mass. App. Ct. at 113-114. Rather, Trooper Marron's cursory statements about the instructions he gave to Moccia relate to the act of how the police baited the trap, i.e., they describe the nature of the police action. Compare *Commonwealth* v. *Massod,* 350 Mass. 745, 747-748 (1966) (police described telephone calls received during execution of a search warrant); *Commonwealth* v. *Washington,* 39 Mass. App. Ct. 195, 200-201 (1995) (police officer allowed to testify to content of phone conversations he had engaged in with women who had placed calls to the defendant's beeper); *State* v. *Romano,* 165 Conn. 239, 248-249 (1973) (police officer described incoming telephone calls received while executing a search warrant); 2 McCormick, Evidence § 249, at 101-102 & n.7 (4th ed. 1992); Liacos, Massachusetts Evidence § 8.2.3 (6th ed. 1994). Contrast *Commonwealth* v. *Diaz,* 426 Mass. 548, 551 (1998) (erroneous admission of extrajudicial statement on the basis of a nonexistent hearsay exception "to show the general atmosphere").

We need not belabor, however, the degree of distinction between the statements we have described in this case and those in the *Soto* case and whether the extrajudicial statements in this case fit comfortably in an established exception to the hearsay rule or in what is not categorized as hearsay. The most damaging inference that the jury might have made from the two statements in question is that Stoico arrived on the scene to pick up the packages of marihuana. That was proved with far greater force by the statements Stoico made in his conversation with Moccia while Stoico was down in the street and Moccia was up in the window. Whatever might be inferred from the extrajudicial statements of Trooper Marron was cumulative and did the defense no further harm.

4. *Stoico's motion to dismiss.* Prior to trial, Stoico moved to dismiss the complaint against him, arguing that (1) the police

lacked probable cause to arrest him; (2) Suffolk County was an improper venue; and (3) the District Court lacks subject matter jurisdiction over drug conspiracy cases. The motion was decided — pursuant to a stipulation of Stoico and the prosecution — on the basis of the facts in Trooper Marron's police report. Our review is based on those same facts, rather than those adduced at trial.

To sustain a complaint, the Commonwealth need only demonstrate probable cause to believe that the defendant committed the crime with which he is charged. *Commonwealth* v. *Cote*, 15 Mass. App. Ct. 229, 237-238 (1983). Probable cause is that amount of information that would warrant a prudent person in believing that the defendant committed the crime. *Commonwealth* v. *Santaliz*, 413 Mass. 238, 241 (1992). *Matter of Ellis*, 425 Mass. 332, 335 (1997). An application for a complaint may be based entirely on hearsay that would not be admissible at trial. *Commonwealth* v. *Cote, supra* at 236.

Trooper Marron's police report states that (1) Moccia accepted delivery of a large shipment of marihuana; (2) Moccia told the troopers that he was paid to pick up the packages on this and on a prior occasion for a man named Rich Moriarty; (3) on the prior occasion, a man named "John" came to Moccia's Charlestown apartment and took the packages; (4) after Moccia's arrest, Moccia conversed with "John" and Moriarty, and was told that "John" would come to Charlestown for the packages; (5) Stoico then showed up at Moccia's apartment, stating he was there to "pick up packages"; and (6) Moccia later identified Stoico as "John." This was easily sufficient to establish probable cause.

The judge's determination that Suffolk County was a proper venue was also sound. A conspiracy may be prosecuted in any county "in which an overt act is committed by any one of the conspirators in execution of the plan," regardless of whether the defendant ever entered the county while the conspiracy was ongoing. *Commonwealth* v. *Stasiun*, 349 Mass. 38, 54 (1965). The police report states that "John" (later identified as Stoico) had come to Moccia's Charlestown apartment (located in Suffolk County) one week earlier to pick up a prior shipment of marihuana, and that the marihuana that was the subject of this prosecution was addressed to the same apartment, to which Stoico again came.

Finally, Stoico claims that the District Court lacks subject

matter jurisdiction over drug conspiracy cases. Under G. L. c. 218, § 26, as appearing in St. 1992, c. 379, § 138, the District Courts have jurisdiction over "all felonies punishable by imprisonment in the [S]tate prison for not more than five years."[2] The crime for which Stoico was convicted — conspiring to distribute marihuana in violation of G. L. c. 94C, § 40 — is punishable by a maximum of two years in a house of correction, see G. L. c. 94C, §§ 40, 32C(*a*), and is, thus, within the jurisdiction of the District Court. See *Commonwealth* v. *Grace*, 43 Mass. App. Ct. 905, 907 (1997). For purposes of determining whether a District Court has jurisdiction over felonies not specifically made part of its jurisdiction, the maximum penalty governs. Smith, Criminal Practice and Procedure § 32 (2d ed. 1983). Compare *Commonwealth* v. *Grace*, *supra* (District Court lacked jurisdiction over conspiracy to distribute heroin, a ten-year felony). Nothing in *Commonwealth* v. *Garcia*, 34 Mass. App. Ct. 386, 388 n.3 (1993), is to the contrary. See G. L. c. 94C, § 40 (the maximum punishment for violation of this section depends upon the crime which was the object of the conspiracy).

*Judgment affirmed.*

---

[2]An earlier provision of the statute that excluded misdemeanor conspiracies from the jurisdiction of the District Courts was repealed in 1958. See St. 1938, c. 365, § 1; St. 1958, c. 138.