MEMORANDUM OF DECISION
 

 ZOBEL, District Judge.
 

 Respondent objects to the Report and Recommendation of the Magistrate Judge that the petition for a writ of habeas corpus be granted. The petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act (“AEDPA”), Pub.L. No. 104-132, 110 Stat. 1214, which amended 28 U.S.C. § 2254 and, the Magistrate Judge ruled, governed the proceedings before him.
 

 To the extent respondent suggests that the Magistrate Judge improperly weighed the evidence, he misconceives the report. The Magistrate Judge certainly reviewed the evidence, and he determined that that evidence was insufficient to convict. But he did so not as a result of weighing it and disagreeing with the state court as to its weight, but because much of the evidence concerning petitioner’s participation recited and relied upon by the state court did not exist; it was not in the record.
 

 To the extent respondent argues that the Magistrate Judge misapplied the AEDPA, the objections are overruled. The Report was filed four days before the
 
 *120
 
 First Circuit issued its first decision interpreting the provision incorporated into 28 U.S.C. § 2254(d)(1) by the AEDPA,
 
 O’Brien v. Dubois,
 
 145 F.3d 16 (1st Cir. 1998). Although the analysis prescribed by
 
 O’Brien,
 
 differs somewhat from that employed by the Magistrate Judge, it does not change the end result.
 

 I begin at the beginning. Under the AEDPA, the writ may be granted only if the state adjudication “resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1).
 
 O’Brien
 
 teaches that the reviewing court must undertake a two-step analysis of the state court decision. See
 
 O’Brien,
 
 145 F.3d at 24. The first question is whether the Supreme Court has prescribed a rule that governs the petitioner’s claim. See
 
 id.
 
 If so, the second question is whether the state court decision is “contrary to” that rule. See
 
 id.
 
 If not, the second question becomes whether the state court’s use (or failure to use) existing law in deciding petitioner’s claim, involved an “unreasonable application” of Supreme Court precedent. See
 
 id.
 

 The Magistrate Judge held that the Supreme Court had articulated a governing rule in
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and
 
 In re Winship,
 
 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and that the state court had posed the appropriate question under that rule; namely, “whether the evidence, viewed in the light most favorable to thé Commonwealth, was sufficient to support a finding that the defendant was guilty of each element of the offenses beyond a reasonable doubt.” See O’Brien, 145 F.3d at 25, n. 6 (noting that
 
 Jackson
 
 provides rule governing insufficiency at evidence claims). Since the state court had articulated the correct question, the Magistrate Judge determined that its ruling was not “contrary to” the Supreme Court rule. He therefore considered the alternative, whether its use of existing law nevertheless involved an “unreasonable application” of the Supreme Court rule, and found that it did.
 

 Since the Magistrate Judge did not have the benefit of the
 
 O’Brien
 
 analysis, the framework for his decision is not entirely in conformity therewith. However his meticulous review of the evidence and his careful and thorough review of state law allow consideration of, and an answer to, the question he should have asked: is the state court’s decision (not merely its recitation of the law) “contrary to” the Supreme Court precedent that prescribes the governing rule? To generate an affirmative response, petitioner must show that Supreme Court precedent “requires an outcome contrary to that reached by the ... state court.”
 
 O’Brien,
 
 145 F.3d at 24-25. For the reasons articulated in the Magistrate Judge’s Report and Recommendation, the record did not show sufficient evidence to support a finding of petitioner’s guilt beyond a reasonable doubt. The state court’s adjudication was, therefore, contrary to the clearly established governing rule, that the evidence in a criminal case must be sufficient to prove each element of the offense beyond a reasonable doubt. Accordingly, I accept the Report and Recommendation.
 

 Judgment may be entered granting the writ.
 

 REPORT AND RECOMMENDATION ON PETITION UNDER § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY (#1)
 

 COLLINGS, United States Magistrate Judge.
 

 I. Introduction
 

 Presently before the Court is petitioner Bernardo Hurtado’s (“Hurtado”) petition for a writ of habeas corpus. Hurtado is paroled on a conviction in the Massachusetts Superior Court for trafficking in cocaine and possession with intent to distrib
 
 *121
 
 ute heroin.
 
 [1]
 
 He seeks relief pursuant to 28 U.S.C. § 2254. As his petition was filed after the effective date of the Anti-Terrorism and Effective Death Penalty Act (“AEDPA”), it is governed by the recently-amended version of 28 U.S.C. § 2254.
 
 See Lindh v. Murphy,
 
 521 U.S. 320, 117 S.Ct. 2059, 2063, 138 L.Ed.2d 481 (1997).
 

 II. Statement of
 
 Facts
 
 [2]
 

 On January 24, 1991, police executed two search warrants for 77 Newbury Street in Lawrence, Massachusetts. The warrants were obtained after several weeks of surveillance of the building and four controlled drug buys by a confidential informant. The building is a three-story, multi-family structure with three apartments on the left-hand side of the building and three apartments on the right. An interior stairway on each side connects the three floors, but the two sides of the building are not accessible to one another, except through the exterior doors. All of the apartments on the left-hand side of the building were vacant, as was the third-floor apartment on the right-hand side. The warrants authorized searches of the first and second-floor apartments on the right.
 
 [3]
 
 *The first-floor apartment was occupied by Lydia Nunez and her six children,
 
 [4]
 
 one of whom was Roberto Nunez. Hurtado and Lydia Nunez were husband and wife. Hurtado also may have lived in the apartment, though the evidence on this point was disputed at trial. Hurtado testified that he and his wife had been separated at the time of the search and that he had been living at another address.
 
 Commonwealth v. Hurtado,
 
 1996 WL 32856, No. 94-P-1821 (Mass.App.Ct. Jan.25,1996) at 1-2 (hereinafter
 
 “Hurtado”).
 

 As police entered the right side of the building, they heard people shouting “Poli-cía” from above them and heard people running. Two officers ran to the second-floor landing, where they encountered Lydia and Roberto Nunez coming down from the third floor. As Roberto Nunez ran down the stairs, officers saw him throw something down; when officers retrieved it, it turned out to be over $6,100.00 in cash. Both Roberto and Lydia Nunez were arrested, while another male fled back up the stairs and into the third-floor apartment.
 
 Hurtado
 
 at 2. An officer pursued the unidentified male into the apartment. The individual escaped, but the pursuing officer found drugs and drug paraphernalia in plain view in the third-floor apartment. The drugs discovered included 29 packages of cocaine weighing 5.34 grams in total; a packet of cocaine weighing 1.09 grams, a bag containing 10.44 grams of cocaine; two white packets and two yellow bags of heroin containing .04 grams each, and 135 blue packets of heroin stamped with the image of a witch and weighing 4.13 grams in total. Among the paraphernalia discovered were a triple-beam scale, a small scale, a heat sealer for plastic bags, strainers, mannitol,
 
 [5]
 
 200-300 empty blue bags, 500 empty white and clear plastic bags, sandwich bags, and blue bags stamped with the image of a witch.
 
 *122
 
 The officer also discovered additional witch stamps, stamp pads, and a pair of scissors with a jagged edge.
 
 Id.
 
 at 2-3.
 
 [6]
 

 At the time the police entered the building, Hurtado was in the first-floor apartment. He emerged from the apartment as police entered; an officer announced he had a warrant to search the apartment and took Hurtado back into the apartment. Hurtado sat at the kitchen table while officers conducted their search; the officer described him as “cooperative.” (# 12, Exh. 8 at 1-161) When requested, Hurtado gave the officers his driver’s license and his car’s registration.
 
 (Id.
 
 at 1 — 128-29) No cash, drugs or drug paraphernalia were found on Hurtado.
 

 In their search of the first-floor apartment, officers discovered eleven small clear plastic bags typically used to distribute a quarter gram of cocaine, along with a small white plastic bag with a witch stamp on it; these were found in a hutch in the kitchen. Inside a false plant pot in the kitchen, police also found three blue bags with witch stamps; lab analysis revealed that the bags contained heroin residue.
 
 Hurtado
 
 at 4. In the master bedroom, police found a piece of paper
 
 [7]
 
 containing drug notations;
 
 [8]
 
 the notations contained references to “Ma,” and were found on top of a dresser along with some gold jewelry and a jewelry box. (# 12, Exh. 8 at 1-125) Somewhere in the master bedroom, officers also found two expired passports belonging to Hurtado, but no one testified where in that room ’ the passports were found.
 

 Police testified that during the four to six weeks of surveillance of the building before they executed the search warrants, they saw Hurtado outside the building “almost all the time” they were there. (# 12, Exh. 8 at 1-94) Police also testified that they witnessed numerous drug transactions outside the building.
 
 (Id.
 
 at 1 — 107-09) The officers testified that they never saw Hurtado participate in any of the transactions; in fact, there was no direct evidence to indicate that Hurtado ever had been present outside the building during a drug transaction.
 
 [9]
 
 Police also testified that a confidential informant conducted four controlled buys at the building; that informant reported dealing with Hispanic men in their early twenties and with Lydia Nunez.
 
 (Id.
 
 at 1 — 158-59) Hurtado was approximately 36 years old at the time of his arrest.
 
 (Id.
 
 at 1-194)
 

 After a jury trial in state court, Hurtado was convicted of one count of trafficking in cocaine
 
 [10]
 
 and one count of possession with
 
 *123
 
 intent to distribute heroin.
 
 [11]
 
 His conviction was affirmed on appeal to the Massachusetts Appeals Court,
 
 see Hurtado,
 
 and the Massachusetts Supreme Judicial Court denied his request for further review. His petition for writ of habeas corpus was filed in this Court less than one year after final resolution of his state appeal,
 
 [12]
 
 so the petition is timely under 28 U.S.C. § 2244(d)(1).
 

 III. Analysis
 

 Hurtado raises three points in his petition for habeas relief. First, he contends there was insufficient evidence to show he was guilty of the crimes charged. Second, he contends the trial court improperly admitted his passports into evidence, since the officer testifying when they were introduced as evidence was not the officer who found the passports. Third, he contends the trial court erred in refusing his request for disclosure of the name of the confidential informant.
 
 [13]
 

 The Court finds the Massachusetts Appeals Court’s decisions regarding the latter two items were correct. No hearsay problem was presented by the introduction of the passports by the officer directing the search;- that officer only testified that the officer searching the master bedroom emerged from that room with the passports and handed them to him. No out-of-court statement was introduced into evidence, so the state appeals court’s rejection of this argument certainly was reasonable. Further, it was not error to deny the request for disclosure of the confidential informant’s identity. Hurtado only sought to elicit from the informant an admission that the informant did not see Hurtado present during any of the controlled buys. The government conceded this fact, so the testimony was not needed.
 

 However, Hurtado’s first point — that the government failed to produce evidence sufficient to show he was guilty of the crime — demands closer scrutiny.
 

 A. Standard of Review
 

 At the close of the Commonwealth’s case, and again at the close of all of the evidence, Hurtado moved for a required finding of not guilty, arguing the Commonwealth had failed to produce evidence which could lead a rational jury to find him guilty beyond a reasonable doubt. (# 12, Exh. 8 at 1 — 168-70, 2-35) On appeal, Hurtado again argued that the Commonwealth had failed to prove its case beyond a reasonable doubt as a matter of law. The Massachusetts Appeals Court found the Commonwealth had produced evidence sufficiently supporting each element of the offense.
 
 Hurtado
 
 at 4-8.
 

 The first step in the Court’s analysis is to assess the standard of review to be used in evaluating Hurtado’s habeas petition. Under the newly-amended version of 28 U.S.C. § 2254, this Court may not grant relief on any claim previously adjudicated on the merits in state court unless that adjudication:
 

 (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
 

 (2) resulted in a decision that was based on an unreasonable determination of the
 
 *124
 
 facts in light of the evidence presented in the State court proceeding.
 

 28 U.S.C. § 2254(d).
 

 No First Circuit decision explains the meaning of this statutory language.
 
 [14]
 
 But in
 
 Gomez v. Acevedo,
 
 106 F.3d 192 (7 Cir., 1997),
 
 vacated on other grds. sub nom., Gomez v. DeTella,
 
 522 U.S. 801, 118 S.Ct. 37, 139 L.Ed.2d 6 (1997), the Seventh Circuit made it clear that a deferential standard of review is imposed by § 2254(d).
 
 Gomez,
 
 106 F.3d at 199. So long as the state court’s determination of the issue presented was reasonable, the conviction must stand.
 
 Id.
 
 “Section 2254(d)(1) ‘requires federal courts to take into account the care with which the state court considered the subject .... [A] responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment.’ ”
 
 Id.
 
 (quoting
 
 Lindh v. Murphy,
 
 96 F.3d 856, 870-71, 877 (7th Cir., 1996),
 
 rev’d on other grds,
 
 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997));
 
 see also Drinkard v. Johnson,
 
 97 F.3d 751, 768-69 (5 Cir., 1996),
 
 overruled on other grds, Lindh,
 
 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (deferential standard of review imposed by § 2254(d)(1)).
 

 Therefore, the Court in this case simply must examine whether the Massachusetts Appeals Court’s decision on Hurtado’s insufficiency of the evidence claim was “contrary to, or involved an unreasonable application of, clearly established” Supreme Court precedent. 28 U.S.C. § 2254(d)(1). It is not enough that this Court might disagree with the state court’s decision in
 
 Hurtado;
 
 rather, the Court must find that the state court’s decision was contrary to Supreme Court precedent or was unreasonable in light of Supreme Court precedent.
 

 B. Controlling Supreme Court Precedent
 

 The controlling Supreme Court precedents here are
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and
 
 In re Winship,
 
 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In
 
 Winship,
 
 the court held that due process required any criminal conviction be supported by proof beyond a reasonable doubt; in essence, the court announced for the first time that this long-employed standard of proof was constitutionally required.
 
 Id.
 
 at 364, 90 S.Ct. 1068. In
 
 Jackson,
 
 the court went a step further and held that the
 
 Winship
 
 rule required a reviewing court to examine the evidence independently to determine whether “after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.”
 
 Jackson,
 
 443 U.S. at 319, 99 S.Ct. 2781.
 
 [15]
 

 
 *125
 
 Though the Massachusetts Appeals Court did not cite
 
 Jackson,
 
 or
 
 Winship
 
 in its consideration of Hurtado’s direct appeal, it did consider “whether the evidence, viewed in the light most favorable to the Commonwealth, was sufficient to support a finding that the defendant was guilty of each element of the offenses beyond a reasonable doubt.”
 
 Hurtado
 
 at 4-5. While the court’s language does not track that in
 
 Jackson,
 
 it cannot be said that the statement in
 
 Hurtado
 
 is “contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1). The question then presented is whether the court’s analysis was “an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States.”
 
 Id.
 

 Jackson
 
 teaches that in examining whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt, the Court must look to the substantive elements of the criminal offense as defined by state law.
 
 Jackson,
 
 443 U.S. at 324 n. 16, 99 S.Ct. 2781. Thus, the Court’s next task is to examine the elements of the crimes charged, as defined by Massachusetts law. If it appears the state appellate court reasonably found that sufficient evidence supported a finding of guilty beyond a reasonable doubt on each of those elements, then the petition will be denied.
 

 C. Elements of the Crimes under State Law
 

 Hurtado was charged under a theory of constructive possession of the drags in the third-floor apartment.
 
 [16]
 
 Under Massachusetts law, an individual may be convicted of possession of a controlled substance (including a charge of trafficking or intent to distribute) if the defendant knew of the presence of the controlled substance and had “the ability and intention to exercise dominion and control over it.”
 
 Commonwealth v. Cruz,
 
 34 Mass.App. Ct. 619, 621, 614 N.E.2d 702, 704 (1993). The “elements of control and power or knowledge, coupled with the ability and intention to exercise dominion and control, may be inferred from circumstantial evidence.”
 
 Commonwealth v. Brown,
 
 34 Mass.App.Ct. 222, 225, 609 N.E.2d 100, 102 (1993). “While presence in an area where contraband is found alone cannot show the requisite knowledge, power, or intention to exercise control over the [contraband] ... presence, supplemented by other incriminating evidence, will serve to tip the scale in favor of sufficiency.”
 
 Commonwealth v. Handy,
 
 30 Mass.App.Ct. 776, 780, 573 N.E.2d 1006, 1009 (1991). Where contraband is found in a dwelling occupied by more than one individual, possession of that contraband is not established simply by the fact of joint occupancy.
 
 Commonwealth v. Carlos,
 
 38 Mass.App.Ct. 929, 929, 646 N.E.2d 764, 765 (1995).
 

 
 *126
 
 D. Evidence Adduced at Trial of Elements of Offenses
 

 Hurtado argues in part that he did not live at 77 Newbury Street, and so could not have known of the presence of drugs on the third floor or have had the ability to exercise dominion or control over them. But the evidence on this point was in conflict. The government presented the driver’s license and auto registration taken from Hurtado’s person at the time the search warrants were executed, and both his license and registration showed his address as 77 Newbury Street. The auto registration had been renewed only ten days earlier. Further, his passports were discovered in the master bedroom in the first floor apartment. Police also testified they saw Hurtado outside the building “almost all the time.” Taking the evidence in the light most favorable to the prosecution, a rational jury could have concluded that Hurtado lived at 77 Newbury Street.
 

 The Appeals Court went on to conclude that a rational jury also could have found Hurtado knew of the drugs in part because the drug note was found in his bedroom in plain view and because bags typically used in drug distribution were found in the kitchen.
 
 Hurtado
 
 at 7.
 
 [17]
 
 This Court need not decide whether it was reasonable to have concluded that these facts sufficiently established Hurtado knew the drugs were on the third floor.
 
 See Commonwealth v. Rivera,
 
 31 Mass.App.Ct. 554, 557, 581 N.E.2d 498, 501 (Mass.App.Ct.1991) (“[0]ne who occupies an apartment ordinarily uses, and is familiar with, contents of the apartment’s kitchen”). Even assuming sufficient evidence was produced to show Hurtado had
 
 knowledge
 
 of the drugs on the third floor, the Appeals Court still had to determine whether sufficient evidence was produced to show Hurtado had the
 
 ability
 
 and the
 
 intent
 
 to exercise dominion and control over those drugs. Thus, for the purposes of the analysis of Hurtado’s claim, I shall assume that there was sufficient evidence for the jury to infer that Hurtado
 
 knew
 
 of the drugs on the third floor.
 

 Did the government also establish beyond a reasonable doubt that Hurtado had the
 
 ability
 
 and the
 
 intent
 
 to exercise dominion or control over the drugs on the third floor? The Massachusetts Appeals Court concluded a rational jury could find ability and intent, and it explained as follows:
 

 In addition, the jury could conclude that the defendant had the ability and intention to exercise control over the drugs found in the third floor apartment because he was present in the locked first floor apartment alone, the packaging found in the first floor apartment and that found on the third floor was similar, the drug note found by his personal papers mentioned quantities contained on the third floor, and the defendant had access to the third floor by the staircase.
 

 Hurtado
 
 at 8.
 

 Was this a reasonable application of the rule in
 
 Jackson?
 
 In
 
 Lindh,
 
 the Seventh Circuit said a state court’s application of Supreme Court precedent was “reasonable” if it provided “a responsible, thoughtful answer reached after a full opportunity to litigate.”
 
 Lindh,
 
 96 F.3d at 871,
 
 rev’d on other grds,
 
 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481. “The statutory ‘unreasonableness’ standard allows the state court’s conclusion to stand if it is one of several equally plausible outcomes.”
 
 Hall v. Washington,
 
 106 F.3d 742, 748-49 (7 Cir., 1997). The Fifth Circuit has explained that a state court’s application of Supreme Court precedent is unreasonable “only when it can be said that reasonable jurists considering the question would be of one view that the state court ruling was
 
 *127
 
 incorrect.”
 
 Drinkard,
 
 97 F.3d at 769,
 
 overruled on other grds, Lindh,
 
 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481.
 

 Certainly the facts set out by the Massachusetts Appeals Court demonstrate an
 
 ability
 
 to control the drugs on the third floor. As indicated, the evidence was sufficient for the jury to find that Hurtado lived in the first-floor apartment, and his sole presence there on the day in question was evidence that showed he lived there. He had access to the third floor via the staircase and so had the ability to control the drugs there. Also, the fact that Hur-tado’s passport was found in the master bedroom on the first floor tended to show he lived there. The evidence of drug packaging found in the first-floor apartment provides some circumstantial evidence that Hurtado knew of the “stash house” operation, since he would be aware of items in the kitchen of the apartment in which he apparently lived.
 
 [18]
 
 Finally, it is clear that persons living in the first-floor apartment — including Lydia and Roberto Nunez — operated the third-floor “stash house.”
 

 The questions remaining are (1) is this evidence sufficient for a jury to find beyond a reasonable doubt Hurtado also had the
 
 intention to exercise dominion and control over the cocaine and heroin in the third-floor apartment,
 
 and (2) was the Massachusetts Appeals Court reasonable in concluding that the evidence was sufficient?
 

 Intent can be shown through circumstantial evidence, and usually is so established in most drug cases. But evidence of intent typically present in other cases seems to be missing here:
 

 1. The drug packaging found on the first floor was found in a common area, rather than in an area where Hurtado kept personal items; thus, it is equally likely that Lydia or Roberto Nunez placed it there.
 

 2. No drugs, drug paraphernalia or money were found on Hurtado.
 

 3. No drugs were found in the first-floor apartment (with the exception of the residue found in the hidden bags seized from the kitchen).
 

 4. No evidence existed to show Hurta-do (or anyone meeting his description) was ever on the third floor.
 

 5. No evidence existed to show Hurta-do ever participated in a drug transaction.
 

 6. Nothing in the drug note found in the master bedroom connects Hurtado to the operation.
 

 7. The drug note, while found in the bedroom apparently used by Hurtado, was found on top of a dresser; along with the note, police saw some gold jewelry and a jewelry box on top of the dresser. There is no evidence that the gold jewelry on top of the dresser or any gold jewelry in the box were of the kind customarily worn by males rather than females. More importantly, no evidence was presented which would demonstrate the dresser also was used by Hurtado. No evidence was presented to show personal items belonging to him were found there. No evidence was introduced to show where Hurtado’s passports were found in the bedroom. There was no evidence that they were found on or in the same dresser on which the drug note was found.
 

 8. Hurtado did not “act guilty” when police arrived with the search warrants. While others ran, he stood still outside the first-floor apartment. While others yelled, “Policía,” he remained silent. A police officer testified that he cooperated while police searched the first-floor apartment.
 

 
 *128
 
 The only circumstantial “evidence” which might show Hurtado had the intent to exercise dominion or control over the drugs on the third floor is the fact that he apparently lived on the first floor and that others who lived in that apartment (his wife and stepson) did operate the stash house. The Court finds that this did not constitute sufficient evidence to establish Hurtado possessed the requisite intent and that it was unreasonable for the Appeals Court to conclude otherwise.
 

 It is important to note that the Appeals Court appears to have overstated the evidence in two respects and that this overstatement led, at least in part, to the conclusion that Hurtado had the intention to exercise dominion and control over the cocaine and heroin in the third-floor.apartment.
 

 First, the Appeals Court concluded that a rational jury could have found Hurtado knew of the drugs in part because “[t]he police observed him at the apartment while drug transactions were occurring.”
 
 Hurta-do
 
 at 7. The statement “at the apartment” is rather ambiguous. Since the drugs which Hurtado was convicted of constructively possessing were found in the third-floor apartment, it is assumed that when the court speaks of “at the apartment,” it means the third-floor apartment. However, there is no evidence whatsoever that the police or anyone else observed Hurta-do at or in the third-floor apartment.
 

 The court may be saying that the police observed Hurtado outside the apartment building at a time when drug transactions were going on in front of the building. In fact, in its statement of facts, the Appeals Court wrote that:
 

 During police surveillance four to six weeks before the search, the defendant. . .was seen outside 77 Newbury Street “almost all the time.” His Lincoln Continental was also seen parked in front of the building. The defendant was present during observed drug transactions, but was not seen participating in them.
 

 Hurtado
 
 at p. 4.
 

 The statement that “the defendant was present during observed drug transactions” is somewhat problematic, and whether this conclusion can fairly be inferred from the evidence is questionable. Presumably, the court’s statement is based on Detective Laird’s testimony that he saw Hurtado outside of 77 Newbury Street “almost all the time [Detective Laird] went by” during the six weeks prior to the search, (# 12, Exh. 8, p. 1-94), and on the following testimony of Detective Lorenzo:
 

 Q: Detective Lorenzo, in the four to six weeks, thereabouts, before you obtained that search warrant, did you, yourself, participate in any surveillance of that building [at 77 Newbury Street, Lawrence, Massachusetts]?
 

 A: Yes, I did.
 

 Q: How many times did you surveil that building?
 

 A: Numerous times. It had to be at least fifteen times — fifteen different occasions that I’ve done surveillances on that building.
 

 Q: Besides the surveillance, that you conducted, did you have occasion, during the course of your normal duties, to pass by the area of that building?
 

 A: I was up there, constantly. Yes.
 

 Q: How many days, would you say, during any given week, you were there? A: I would say, almost every day that I was working, that I was out on the road, I was in that area.
 

 Q: And typically, during that period, what kind of shift did you work, per week; how many days a week?
 

 A: We work four days on, and two days off.
 

 Q: In the four to six weeks that you conducted the surveillance, yourself, were you in uniform?
 

 A: No.
 

 Q: Were you in a cruiser?
 

 
 *129
 
 A: No.
 

 Q: Were you with anybody?
 

 A: Yes.
 

 Q: Who was that?
 

 A: Usually, I am with Detective William Lees.
 

 Q: Was he in uniform?
 

 A: No.
 

 Q: Can you describe the last time before you got the search warrant, when it was that you surveilled that building, 77 Newbury Street?
 

 A: To the best of my memory, it was the night before, or the day before, on the 23rd of January.
 

 Q: How long did you watch the building, at that time?
 

 A: I don’t recall. I’d say, at least an hour; but, I don’t recall.
 

 Q: Can you describe to the jurors what you observed in the area of 77 Newbury Street on that occasion, on the 23rd?
 

 A: On that day, I observed, there would be people standing out in front of 77 Newbury Street; I would observe people walking up; they’d have contact with the people out in front. To my knowledge, transactions were being made—
 

 Q: What did you see?
 

 Describe what you saw.
 

 A: Somebody would hand — The hands would meet. Something would be handed. Money would be handed, in return. Q: How many times did you see such an exchange?
 

 A: On the day?
 

 Q: Yes.
 

 A: I just don’t recall. I couldn’t tell you, right now.
 

 Q: Was it more than once?
 

 A: Oh, yes.
 

 Q: Less than ten times?
 

 A: I would say, somewhere around seven or eight times, at least.
 

 Q: Did you see anybody enter or leave that building at 77 Newbury Street, during this interval?
 

 A: Yes.
 

 Q: Who were the persons?
 

 Just generally, again, describe the persons.
 

 A: Who were the people?
 

 Q: Yes.
 

 What were their roles?
 

 What did you see them doing?
 

 A: When someone would approach them, they’d run up to the side of the house to the side door. Come back out, and money would be handed to them. Q: Did you see them actually enter the building at 77 Newbury Street?
 

 A: On the side door, yes.
 

 Q: Would you describe to the jurors, as you saw the building from the street, Newbury Street, what side of the building are you referring to?
 

 A: Right side.
 

 Q: How many doors are over there; do you know?
 

 A: In the back?
 

 Q: On the side.
 

 A: On the back side, to the best of my memory, there were two doors; one led to the hallway, and one led to a shed area, if I remember right.
 

 Q: Do you know which door the people, that you saw go in and out, were using? A: Well, to me, it appeared to be the first door.
 

 Q: Which door was that?
 

 Can you describe it?
 

 A: That would go into the hallway leading to the apartments on that side. Q: At the times that you surveilled the building, before January 23rd, can you describe what you saw on those occasions?
 

 A: On my other surveillances?
 

 Q: Yes.
 

 
 *130
 
 A: The same type of1 transactions that were going on.
 

 Q: Did you conduct the surveillance at any particular time of day?
 

 A: Different times and, sometimes, at night.
 

 Q: Detective Lorenzo, based on your training and experience, is the type of foot traffic, that you saw, and the transactions, .as you described them, have any significance to you?
 

 A: Yes.
 

 Q: What is the significance?
 

 A: In my opinion, there was drug dealing going on at that location.
 

 Q: How did you form that opinion from what you saw?
 

 A: This is consistent with other locations, that I’ve dealt with, as far as drug deals being made on a street level.
 

 Q: Detective Lorenzo, during the time that you watched the building, or had occasion to be near it, did you see anybody, who is now present in this courtroom, in the area of that building?
 

 A: Yes.
 

 Q: Who is that?
 

 A: The defendant, Mr. Hurtado.
 

 MR. GANNON: Your Honor, may the record reflect that he’s identified the defendant.
 

 THE COURT: Yes, it may.
 

 Q: Detective Lorenzo, is it fair to say that you knew the defendant, by name, before this event of January 24th?
 

 A: Yes, I did.
 

 Q: And, you met him before, in fact?
 

 A: Yes.
 

 Q: Did you see him involved in any of the transactions, that you described?
 

 A: No, I did not.
 

 # 12 at Exh. 8, pp. 1-105 — 1-110.
 

 A close reading of the transcript reveals that the witness never testified that Hurta-do was present at those times when these drug transactions were occurring in front of the apartment building. In other words, the prosecutor never asked the witness whether Hurtado was present at any time when drug dealing was taking place. One might infer from the number of times when the officer saw drug dealing in front of 77 Newbury Street and the number of times he saw Hurtado in front of 77 New-bury Street that there were times he made both observations, i.e., drug dealing and Hurtado present in the area of the building, simultaneously.
 

 However, the most which could be inferred is that at times when officers saw drug dealing occurring outside 77 New-bury Street, Hurtado was present in the area but did not participate in any of the transactions. And this is the most that the Appeals Court’s statement that “[t]he police observed [Hurtado] at the apartment when drug transactions were occurring” can mean.
 

 I need not decide whether the inference can be fairly made from the evidence because the Appeals Court cited this evidence to find that the jury could have inferred that Hurtado knew of the drugs on the third floor. As indicated on page 16, supra, I have assumed for purposes of this report and recommendation that there was sufficient evidence to infer that Hurta-do knew of the drugs on the third floor.
 

 The second overstatement is of more consequence. In concluding that there was sufficient evidence that Hurtado had the intention to exercise control over the drugs found in the third-floor apartment, the Appeals Court relied on the “fact” that “.. .the drug note found by his personal papers mentioned quantities contained on the third floor...”
 
 Hurtado
 
 at 8. As indi- ' cated,
 
 supra,
 
 the drug note was found next to a jewelry case on a dresser in the bedroom of the first-floor apartment. There was no evidence whatsoever that any of Hurtado’s personal possessions or papers were found in or about that dresser. Rather, the most the evidence showed was that the two expired passports came somewhere from the same bedroom. The Appeals Court’s statement that the drug
 
 *131
 
 note was “found by his personal papers” can mean no more than the personal papers, i.e., two expired passports, were found in the same room as the drug note.
 

 With these clarifications of precisely what the evidence was, the Court has reviewed the Massachusetts cases involving constructive possession to determine if the evidence in the instant case was sufficient to find that Hurtado intended to exercise dominion and control over the heroin and cocaine in the third-floor apartment.
 

 E. Cases Involving Constructive Possession
 

 At oral argument, this Court asked the parties to provide supplemental briefing and to set out any cases in which similar facts were found sufficient to support a conviction under a theory of constructive possession.
 
 [19]
 
 However, the cases presented by the respondents do not help to show that the Appeals Court’s decision here was reasonable.
 

 For instance, in
 
 Commonwealth v. Gonzalez,
 
 42 Mass.App.Ct. 235, 675 N.E.2d 1177 (1997), the defendant was convicted of trafficking in cocaine under a theory of constructive possession. The cocaine in question was concealed on a first-floor back porch accessible by defendant (who, the evidence tended to show, occupied a first-floor apartment) and the residents of five other apartments in the building.
 
 Gonzalez,
 
 42 Mass.App.Ct. at 236, 675 N.E.2d at 1178. The only question presented on appeal was whether sufficient evidence was presented to establish that the defendant constructively possessed the cocaine on the back porch. Other evidence tended to show the defendant was involved in drug trafficking: a scale and lactose were found in the kitchen of the apartment, bills from a paging service were found in his bedroom, personal papers showed he had lived at three addresses in the previous seven months, and over $1,200.00 in cash and personal papers containing the name of the defendant had been found in a bureau drawer.
 
 [20]
 

 Id.
 
 at 237, 238, 675 N.E.2d at 1179-80. More important for present purposes, no one else was shown to live at the apartment other than the defendant, although an unidentified woman was in the apartment when the officers executed the search warrant. The Massachusetts Appeals Court found the evidence sufficient to support the conviction.
 
 Id.
 
 at 241, 675 N.E.2d at 1181.
 

 In contrast, no independent evidence shows Hurtado was involved in drug dealing; there was no evidence that he used the bureau on which the drug note was found and there was no evidence that the drug note was found with any of Hurtado’s personal papers. In addition, the eleven small plastic bags found in the kitchen (and the three bags hidden in the kitchen) were just as likely to have been placed there by co-occupants Lydia or Roberto Nunez. No scales or cutting agent were found in the apartment, Hurtado was not found in possession of any cash, and no other behavior typical of drug dealers was attributed to Hurtado.
 

 In
 
 Commonwealth v. Pratt,
 
 407 Mass. 647, 555 N.E.2d 559 (1990), the defendant and her husband were both charged with possession and distribution of controlled substances found in their home and on land located behind the home. In order to show the defendant had the ability and intent to exercise control over the drugs in question, the government showed not only that some of the drugs were found in the
 
 *132
 
 home she occupied with her husband,
 
 [21]
 
 but also that they were found on an open shelf along with towels, stockings, and toiletries
 
 [22]
 

 Id.
 
 at 652, 555 N.E.2d at 563. The defendant had been sitting quietly while the police searched the home, but as police began to reach for the shelf, she stood up, pointed at the shelf, and began to speak. The court concluded this behavior demonstrated knowledge of the shelfs contents.
 
 Pratt,
 
 407 Mass, at 650, 651-52, 555 N.E.2d at 562, 563. The court reasoned that where controlled substances are found in a home jointly occupied by one or more persons, a jury may conclude an occupant has the intent to possess those substances where “the contraband was found in proximity to personal effects of the defendant in areas of the dwelling, such a bedroom or closet, to which other evidence [in that case, defendant’s gesture and attempt to speak] indicates the defendant has a particular relationship.”
 
 Id.
 
 (quoting
 
 Commonwealth v. Rarick,
 
 23 Mass.App.Ct. 912, 912, 499 N.E.2d 1233, 1233-34 (1986)). The court further concluded that a reasonable jury could have inferred from the defendant’s possession of drugs in the house, the similarity in packaging between the drugs in the house and those outside, and the presence of a drug transaction sheet in plain view in the house that she intended to possess the drugs found outside as well.
 
 Id.
 
 at 652-53, 555 N.E.2d at 562.
 

 Unlike the facts in the
 
 Pratt
 
 case, the facts here do not demonstrate Hurtado had the intent to exercise dominion and control over the drugs on the third floor. No drugs at all were found in the first-floor apartment. No paraphernalia associated with drugs or drug dealing were found “in proximity to personal effects of the defendant in areas of the dwelling, such as a bedroom or closet, to which other evidence indicates the defendant has a particular relationship.” The empty plastic bags were found in the kitchen, so were just as likely to have been placed there by Lydia or Roberto Nunez.
 
 [23]
 
 And though the drug note was found on- a bureau in the bedroom which Hurtado presumably occupied, there was no evidence that the note belonged to Hurtado or that any of his personal possessions were in the bureau. Even if the Court presumes that Hurtado would read documents on this bureau and thus be aware of the contents of those documents, at most the presence of the note in plain view in their bedroom shows Hurtado had knowledge of the scale of his wife’s drug operation. But the presence of the note, in the absence of other incriminating evidence, does nothing to show Hurtado had any intent to exercise dominion or control over the drugs in the third-floor apartment.
 

 In another case cited by respondents,
 
 Commonwealth v. Carmenatty,
 
 37 Mass.App.Ct. 908, 638 N.E.2d 496 (1994), police searched the home shared by defendant and his girlfriend. In a dresser drawer, police found men’s and women’s underclothes as well as a precision scale typically used by drug dealers. The girlfriend was found in possession of several bags of cocaine. No drugs were found on the defendant, but he was carrying two fifty dollar bills. A jury convicted the defendant of possession with intent to distribute the cocaine found on his girlfriend.
 
 Id.
 
 at
 
 *133
 
 909-10, 638 N.E.2d at 497. The court concluded that a reasonable jury could find the defendant was in constructive possession of the scale, since it was found in a bedroom drawer he apparently shared with his girlfriend. The court further found that the cash in the possession of defendant was additional evidence of his involvement in drug trading; while the amount was not large, the court noted it was significant in light of the fact that the defendant was a welfare recipient.
 
 Id.
 
 at 910, 638 N.E.2d at 498.
 

 The facts in
 
 Carmenalty
 
 clearly are distinguishable from those in the case at bar. No money was found on Hurtado, and no evidence of drug trading was found amongst his personal effects. No other evidence, other than Hurtado’s simple occupancy of the first-floor apartment, ties him to the drug operation on the third floor. And this fact is insufficient as a matter of law to establish constructive possession.
 
 Carlos,
 
 38 Mass.App.Ct. at 929, 646 N.E.2d at 765.
 

 In
 
 Commonwealth v. Cohen,
 
 6 Mass.App.Ct. 653, 382 N.E.2d 1105 (1978), the defendant was convicted of unlawful possession of controlled substances and of hypodermic needles and syringes. Police executed a search warrant at the apartment of a co-defendant at 119 Charles Street, Boston and found drugs, needles and syringes in the bedroom in a bureau. The defendant was present in the apartment at the time of the search and correspondence addressed to him at another address (28 Leland Street, Jamaica Plain) was found in the same bureau in which the drugs were seized.
 
 Id.
 
 at 656, 382 N.E.2d at 1108. The court found the evidence was sufficient to support a conclusion that the defendant resided at the apartment and that the defendant controlled the items found in his bedroom.
 
 Id.
 
 at 658, 382 N.E.2d at 1109.
 

 In
 
 Cohen,
 
 it was reasonable to infer that the items found in the bureau were in the possession of the defendant because they were found in a bureau along with personal correspondence addressed to him and because of his presence in the apartment. It is not reasonable to reach a similar conclusion in Hurtado’s case because the only thing found in the bedroom was the drug note on the bureau, and there was no evidence whatsoever that the bureau was used by Hurtado or that any of his papers were found in it. All that the evidence reveals was that two of his passports were found somewhere in the bedroom. This Court has been unable to find any Massachusetts appellate court opinion (other than the one at issue) which would support the conclusion reached by the Appeals Court in this case.
 
 [24]
 
 This Court also has reviewed a number of decisions from other jurisdictions in which similar rules regarding constructive possession are applied. No case seems consistent with the result reached by the Massachusetts Appeals Court here.
 
 [25]
 
 Thus, given the evidence
 
 *134
 
 courts in Massachusetts and in other jurisdictions have required in order to establish constructive possession, this Court cannot say that the Massachusetts Appeals Court’s decision in
 
 Hurtado
 
 was reasonable.
 

 F. “Reasonableness” under the Seventh Circuit’s Standard
 

 Furthermore, if this Court were to apply the Seventh Circuit’s standard for judging whether a state court’s decision was reasonable, the Court still would conclude that habeas relief should be granted.
 
 Lindh
 
 held that a state court decision was “reasonable” if it provided “a responsible, thoughtful answer reached after a full opportunity to litigate.”
 
 Lindh,
 
 96 F.3d at 871,
 
 rev’d on other grds,
 
 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481. But this Court cannot find that that standard has been met here, for three reasons.
 

 First, the Appeals Court asserted that Hurtado had been present at the apartment while drug transactions were occurring.
 
 Hurtado
 
 at 4. As discussed on pages 127-130,
 
 supra,
 
 this is an overstatement. This Court cannot say that this overstatement contributed to a “responsible, thoughtful answer.”
 
 Lindh,
 
 96 F.3d at 871.
 

 Second, the Appeals Court’s statement in its opinion that “.. .the drug note found by his personal papers mentioned quantities contained on the third
 
 floor..Hur-tado
 
 at 8, is a more serious overstatement, as discussed on pages 130-131,
 
 supra.
 
 No evidence was produced to show where Hurtado’s personal papers were found in the bedroom; there is no evidence that the “drug note” was found “by” his papers. Since the only evidence of what was contained in or on the bureau apart from the drug note was gold jewelry and a jewelry box, there is no evidence which would connect Hurtado to that bureau. These are critical facts and this Court cannot say that the Massachusetts Appeals Court gave “a responsible, thoughtful answer” when it overstated the picture by painting with such a broad brush.
 

 Finally, it is not clear how the evidence cited by the Massachusetts Appeals Court actually supports a finding of intent to exercise dominion and control over the narcotics on the third floor. It is clear that the evidence shows an ability to exercise dominion or control. But the court addressed both the requirement of ability and the requirement of intent in one paragraph, and it did not distinguish which evidence established each of those two elements. It is difficult to discern which evidence the court deemed relevant to the element of intent alone. In blending its analysis of the elements of ability and intent — two distinct elements of constructive possession — the Massachusetts Appeals Court did not meet the standard of a “responsible, thoughtful answer.”
 

 TV. Summary and Conclusion
 

 I accept as a given that intent is ordinarily proved by circumstantial evidence from which the jury can infer an intent to exercise dominion and control over the narcotics. I also accept that I must take the evidence in the light most favorable to the Commonwealth and must draw all reasonable inferences from that evidence which would support the verdict.
 

 However, it is also the law that “knowledge of the presence of drugs by itself is not sufficient to establish possession” and “possession [is not] proved by the fact of sharing living quarters.”
 
 Carlos,
 
 38 Mass. App.Ct. at 929, 646 N.E.2d at 765 (citations omitted). In this case, although Hur-tado may have shared living quarters in the first-floor apartment, knew of the presence of drugs on the third floor, and had the ability, i.e., could if he chose, to exercise control over those drugs, the evidence is insufficient to establish that he intended
 
 *135
 
 to exercise dominion and control over the drags found in the third-floor apartment.
 

 Thus, I RECOMMEND that the petitioner’s petition for relief under 28 U.S.C. § 2254 be GRANTED.
 

 V. Review by the District Judge
 

 The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to this report and recommendation must file a written objection thereto with the Clerk of this Clerk within 10 days of the party’s receipt of this Report and Recommendation. The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review.
 
 See Scott v. Schweiker,
 
 702 F.2d 13, 14 (1 Cir., 1983);
 
 United States v. Vega,
 
 678 F.2d 376, 378-379 (1st Cir., 1982);
 
 Park Motor Mart, Inc. v. Ford Motor Co.,
 
 616 F.2d 603 (1 Cir., 1980).
 
 See also Thomas v. Arn,
 
 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).
 

 [1]
 

 . Parole is tantamount to “custody” for purposes of satisfying the requirement of § 2254 that the petitioner be “in custody pursuant to the judgment .of a State court." Because of his conviction, the Immigration and Naturalization Service ("INS”) is attempting to deport Hurtado to his native Dominican Republic. His appeal of a deportation order is pending.
 

 [2]
 

 . Unless otherwise noted, the statement of facts is taken from the opinion of the Massachusetts Appeals Court in Hurtado’s direct appeal;
 
 see Commonwealth v. Hurtado,
 
 1996 WL 32856, No. 94-P-1821 (Mass.App.Ct., Jan.25, 1996). The facts drawn from that opinion are those undisputed by Hurtado in his petition.
 

 [3]
 

 . A woman lived on the second floor with her four children, ranging in age from nine to seventeen. (# 12, Exh. 8 at 1-182) Nothing relevant to the investigation was found in the second floor apartment.
 

 [4]
 

 . The youngest of those six children also was the daughter of Hurtado.
 

 [5]
 

 . Mannitol is a substance commonly used to dilute cocaine.
 

 [6]
 

 . An officer testified that the witch stamp and the jagged-edged scissors were typically used in the Lawrence area to “brand” heroin. (# 12, Exh. 8 at 1-120, 138-39, 163)
 

 [7]
 

 . This piece of paper shall hereinafter be referred to as the "drug note.”
 

 [8]
 

 . The note contained statements such as "sold one for 30” and "one for 70.” An officer experienced in the investigation of drug operations testified that these notations referred to quantities and prices of drugs sold. (# 12, Exh. 8 at 1-126)
 

 [9]
 

 .
 
 See
 
 discussion,
 
 infra,
 
 at pp. 127-130.
 

 [10]
 

 . Under Massachusetts law, a defendant may be charged with "trafficking” in a controlled substance, which carries a heavier penalty than "possession with intent to distribute” a controlled substance, where the quantity of drugs allegedly attributable to the defendant meets a minimum statutory amount.
 
 See
 
 Mass. Gen. Laws ch. 94C, § 32E (trafficking);
 
 cf.
 
 Mass. Gen. Laws ch. 94C, § 32 (possession with intent to distribute). Hurtado was charged under Mass. Gen. Laws ch. 94C, § 32E(b)(l) with trafficking in cocaine, because police discovered more than 14 grams but less than 28 grams of cocaine in the thirdfloor apartment; that statute imposes a maximum term of imprisonment of 15 years, with a minimum term of imprisonment of three years;
 
 cf.
 
 Mass. Gen. Laws ch. 94C, § 32(a) (maximum term of imprisonment for possession with intent to distribute is ten years; no minimum term imposed). The trafficking statute could not be applied to the heroin charge, since police discovered less than 14 grams of heroin in the third floor apartment.
 
 See
 
 Mass. Gen. Laws ch. 94C, § 32E(b).
 

 [11]
 

 . Lydia and Roberto Nunez also were charged with the same offenses but they fled after being released by the state court and were at large at the time of Hurtado’s sentencing. Hurtado was also on bail but he never defaulted.
 
 (See
 
 # 12 at Exh. 8, pp. 3-5-3-6)
 

 [12]
 

 . The Massachusetts Supreme Judicial Court denied his application for further judicial review on March 25, 1996, and this petition was filed on September 24, 1996.
 

 [13]
 

 . In their Answer, the respondents alleged that Hurtado had failed to exhaust his state court remedies with respect to all grounds in his petition.
 
 {#
 
 11 at 4;
 
 see Rose v. Lundy,
 
 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982)) However, respondents have since expressly waived the affirmative defense of exhaustion. (# 17 at 2 n. 2;
 
 see
 
 28 U.S.C. sec. 2254(b)(3) (State must expressly waive exhaustion requirement through counsel))
 

 [14]
 

 . In
 
 Martin v. Bissonette,
 
 1997 WL 280602, No. 96-1856 (1 Cir., May 29, 1997),
 
 opinion withdrawn,
 
 118 F.3d 871 (1 Cir., 1997), the First Circuit explained its view of the standard set out in 28 U.S.C. § 2254(d). The opinion was withdrawn when the Supreme Court ruled in
 
 Lindh
 
 that AEDPA should not be applied retroactively.
 
 Martin v. Bissonette,
 
 118 F.3d 871, 874 n. 3 (1 Cir., 1997). The First Circuit currently is considering a case which may provide the opportunity to revisit the question of how 28 U.S.C. § 2254(d) is to be interpreted;
 
 see O'Brien v. Dubois,
 
 Ct.App. No. 97-1979. Pending a decision in
 
 O'Brien,
 
 this court will be guided by decisions from other circuits interpreting 28 U.S.C. § 2254(d), and by a statement in dicta in the original
 
 Martin
 
 opinion that this Circuit's approach would not differ substantially in practical effect from that suggested by other circuits.
 

 The original
 
 Martin
 
 opinion also suggested that in order to determine whether the state court decision in question was a “reasonable application” of Supreme Court precedent, courts should review decisions of the lower courts. If other courts have applied Supreme Court precedent in a manner similar to the decision in question, then the Court should conclude that the decision in question was "reasonable.” This Court will follow that suggestion in its attempt to determine whether the state court decision at issue here was “reasonable.”
 

 [15]
 

 .
 
 Jackson
 
 was a habeas corpus action challenging a state court conviction. In
 
 Jackson
 
 the Supreme Court further held that the fed
 
 *125
 
 eral court’s review of the sufficiency of the evidence supporting a state court decision should be
 
 de novo. Jackson,
 
 443 U.S. at 321-24, 99 S.Ct. 2781. Since AEDPA adopted a deferential standard toward state court judgments, this part of
 
 Jackson
 
 may be in doubt. The court will assume this is so, and apply ihe deferential standard imposed by AEDPA in reviewing the Massachusetts Appeals Court’s decision regarding the sufficiency of the evidence.
 

 [16]
 

 . Alternatively, the Commonwealth charged Hurtado under a “joint venture” theory; Massachusetts law uses the term "joint venture” to describe the legal theory more typically termed “aiding and abetting.” The jury was instructed under both theories, but its verdict did not specify which of the two theories it accepted. The Massachusetts Appeals Court found it unnecessary to examine whether sufficient evidence existed to support this alternative theory, though it acknowledged that had insufficient evidence existed to support the constructive possession charge, reversal and retrial would have been necessary, since it was unclear which of the two theories had been accepted by the jury.
 
 Hurtado
 
 at 5 n. 1 (citing
 
 Commonwealth v. Fickett,
 
 403 Mass. 194, 198, 526 N.E.2d 1064 (1988);
 
 Commonwealth v. Pichardo,
 
 38 Mass.App.Ct. 416, 417 n. 2, 647 N.E.2d 1236 (1995);
 
 Commonwealth v. Kickery,
 
 31 Mass.App.Ct. 720, 724, 583 N.E.2d 869 (1991);
 
 Commonwealth v. El-dridge,
 
 28 Mass.App.Ct. 936, 938, 549 N.E.2d 1139 (1990)).
 

 [17]
 

 . The court also relied on the alleged fact that “[t]he police observed him at the apartment while drug transactions were occurring.”
 
 Hurtado
 
 at 7. As noted, there is no direct evidence to support this assertion, and as discussed,
 
 infra
 
 at pp. 127-130, the circumstantial evidence does not support such a broad assertion.
 

 [18]
 

 . It is not entirely clear, though, that Hurta-do would have been aware of the three witch-stamped bags containing heroin residue, which were hidden in the bottom of a false plant pot. It is equally reasonable to assume that either Lydia or Roberto Nunez hid the bags there without Hurtado’s knowledge.
 

 [19]
 

 . This was done in order to follow the suggestion in the original
 
 Martin
 
 opinion that this Court review other decisions on the same issue in order to determine whether the state court’s conclusion could be termed “reasonable.”
 
 See
 
 in. 14,
 
 supra.
 

 [20]
 

 . An expert testified that drug dealers typically used scales similar to the one found, that lactose was often used to dilute cocaine for sale at "street level,” and that drug dealers commonly used pagers, frequently changed their locations, and dealt in cash.
 
 Gonzalez,
 
 42 Mass.App.Ct. at 235, 675 N.E.2d at 1179.
 

 [21]
 

 . Partially burnt glassine bags also were found in plain view on the stove in the house; the bags were stamped with a heroin "brand” typical in the local area.
 
 Pratt,
 
 407 Mass, at 649-50, 555 N.E.2d at 562.
 

 [22]
 

 . In that closet, police found forty-four bags of heroin, forty-four methaqualude tablets, a bottle of methadone tablets, and seven syringes and needles.
 
 Pratt,
 
 407 Mass, at 652, 555 N.E.2d at 563.
 

 [23]
 

 . Furthermore, there were only a small number of plastic bags found in the firstfloor apartment in the Hurtado case. By contrast, in the
 
 Pratt
 
 case, the police found in the dwelling forty-four separately packaged bags of heroin, wrapped in packets of ten each (and one packet of four bags); forty-four separately wrapped methaqualone tablets; and a bottle of fifty-two methadone tablets.
 
 Pratt,
 
 407 Mass, at 650, 555 N.E.2d at 562.
 

 [24]
 

 . Additional cases reviewed by the court include:
 
 Commonwealth v. Montanez,
 
 410 Mass. 290, 571 N.E.2d 1372 (1991);
 
 Commonwealth v. Rivera,
 
 31 Mass.App.Ct. 554, 581 N.E.2d 498 (1991);
 
 Commonwealth v. Booker,
 
 31 Mass.App.Ct. 435, 578 N.E.2d 815 (1991);
 
 Commonwealth v. Handy,
 
 30 Mass. App.Ct. 776, 573 N.E.2d 1006 (1991);
 
 Commonwealth v. James,
 
 30 Mass.App.Ct. 490, 570 N.E.2d 168 (1991);
 
 Commonwealth v. Rarick,
 
 23 Mass.App.Ct. 912, 499 N.E.2d 1233 (1986);
 
 Commonwealth v. LaPerle,
 
 19 Mass.App.Ct. 424, 475 N.E.2d 81 (1985);
 
 Commonwealth v. Williams,
 
 3 Mass.App.Ct. 370, 330 N.E.2d 502 (1975);
 
 Commonwealth v. Lee,
 
 2 Mass.App.Ct. 700, 319 N.E.2d 732 (1974);
 
 Commonwealth v. Gill, 2
 
 Mass.App.Ct. 653, 318 N.E.2d 628 (1974);
 
 Commonwealth v. Xiarhos, 2
 
 Mass.App.Ct. 225, 310 N.E.2d 616 (1974);
 
 Commonwealth v. Mott,
 
 2 Mass.App.Ct. 47, 308 N.E.2d 557 (1974).
 

 [25]
 

 . Cases from other jurisdictions reviewed by the court include the following:
 
 Heard v. State,
 
 574 So.2d 873 (Ala.Crim.App.1990);
 
 Wooldridge v. State,
 
 489 So.2d 703 (Ala.Crim.App.1986);
 
 Embry v. State,
 
 302 Ark. 608, 792 S.W.2d 318 (1990);
 
 Osborne v. State,
 
 278 Ark. 45, 643 S.W.2d 251 (1982);
 
 Wheeler v. United States,
 
 494 A.2d 170 (D.C.Ct.App.1985);
 
 Gaynus v. State,
 
 380 So.2d 1174 (Fla.Dist.Ct.App.1980);
 
 Thompson v. State,
 
 375 So.2d 633 (Fla.Dist.Ct.App.1979);
 
 Clayton v. State,
 
 582 So.2d 1019 (Miss.1991);
 
 State v. Hall,
 
 680
 
 *134
 
 S.W.2d 179 (Mo.Ct.App.1984);
 
 Commonwealth v. Jackson,
 
 540 Pa. 556, 659 A.2d 549 (1995).